IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID C. THOMPSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) No. 2:04-cv-1692 |
| JO ANN B. BARNHART, COMMISSIONER OF SOCIAL SECURITY, | ) ) Judge Thomas M. Hardiman ) ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

**I.  Introduction**

Plaintiff David C. Thompson (Thompson) brings this action pursuant to 42 U.S.C. §405(g) of the Social Security Act (Act), seeking review of the final determination of the Commissioner of Social Security (Commissioner) denying his application for disability insurance benefits (DIB). This matter is before the Court on the parties' cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure based on the record developed at the administrative proceedings.

After careful consideration of the Administrative Law Judge's (ALJ's) decision, the memoranda of the parties and the entire record, the Court finds the ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment will be denied and the Commissioner's determination will be affirmed.

## II. Procedural History

Plaintiff Thompson filed an application for DIB on April 2, 2003. (R. 14, 70). After an initial denial on June, 10, 2003, he then filed a request for reconsideration on June 25, 2003, which was denied. (R. 53, 55, 57). Thompson filed a second request for reconsideration on October 7, 2003. (R. 61). After a hearing in Pittsburgh on March 31, 2004, ALJ Steven D. Slahta issued a decision on June 5, 2004 denying benefits. (R. 14-22). Thompson filed a request for review, which the Appeals Council denied on September 7, 2004. (R. 7). The instant appeal was filed on November 8, 2004.

## III. Statement of Facts

At the time of his hearing, Plaintiff Thompson was a 48 year old male, making him a "younger person" under the regulations. He has a ninth-grade education and worked previously as a laborer and truck driver. (R. 98, 103, 123-125). Thompson claims he has been unable to work since November 15, 2002. (R. 70). He sought treatment and/or evaluation from Allegheny General Hospital (R. 151-73); Butler Memorial Hospital (R. 174-209); John Reefer, M.D. (R. 210-231); and S.K. Sethi, M.D., a cardiovascular disease specialist. (R. 242-53, 265-74).

Thompson has a history of coronary artery disease and hypertension. (R. 152-53). On November 10, 1994, George Liebler, M.D., performed a coronary artery bypass graft operation on him and soon thereafter he suffered a partial lung collapse. (R. 168, 172-73). Thompson was told not to work for six weeks (R. 152), but eventually he returned to his laborer/driver job. (R. 98). On March 3, 2000, Dr. Sethi performed a left heart catheterization and noted that a stent was placed successfully in Thompson's mid-right coronary artery with no residual stenosis and his left ventricular function was normal. (R. 181-83). On May 5, 2001, Thompson had another

cardiac catheterization after which Dr. Sethi found: moderate aortic stenosis with aortic insufficiency; a hypertrophied left ventricle with normal left ventricular functions; total occlusion of the left anterior descending artery after the first septal perforator branch and a small diagonal branch prior to which it had a 90% stenosis; moderate atherosclerosis of the left circumflex artery; and moderately severe diffuse atherosclerosis of the right coronary artery. (R. 179-180). Consequently, Dr. Sethi facilitated an echocardiogram, which was performed on June 6, 2002 and revealed that Thompson had developed progressive aortic valve stenosis. (R. 175, 218).

Upon a follow-up visit to his treating physician, Dr. Reefer, on July 26, 2002, Thompson denied increased shortness of breath, stated that his walking was unlimited on the level, and said he was able to do heavy paving work. (R. 218). Thompson told Dr. Reefer that he experienced chest discomfort about twice a week, which was relieved with nitroglycerin and that he had "a little" shortness of breath and "occasional palpitations" if he worked too hard. (R. 218). Dr. Reefer found Thompson's blood pressure and lipid level elevated and he advised Thompson to follow-up with Dr. Sethi and recommended that he stop or decrease his smoking and alcohol consumption. (R. 218-220).

When Thompson returned to see Dr. Reefer in January 2003, he stated that he had not kept his follow-up appointment with Dr. Sethi in November 2002 because he had gone hunting. (R. 216-218). At the time of this visit with Dr. Reefer, Thompson was "laid off" from work. (R. 217). He complained of chest discomfort but said he experienced "good" relief with nitroglycerin; in fact, he denied experiencing any discomfort when he wore a nitroglycerin patch. (R. 216). Accordingly, Dr. Reefer said it was unclear why Thompson did not wear a patch every day. (R. 216).

Because Thompson's prior echocardiogram had suggested progressive aortic valve stenosis, he underwent a cardiac catheterization on January 31, 2003, which showed hypertrophied left ventricular function but normal systolic function. (R. 238). The aortogram showed aortic insufficiency, however, so Thompson was referred to Dr. El-Khatib for surgical evaluation. (R. 238). Based on a February 13, 2003 examination, Dr. El-Khatib recommended aortic valve replacement, which was performed successfully on March 10, 2003. (R. 189, 204-05, 240). A few weeks later, on March 28, 2003, Thompson visited Dr. Reefer and stated that he felt "good" with no chest pain. (R. 210-11). Dr. Reefer found Thompson was doing "well" and advised him to return for a follow-up visit in six months. (R. 211).

Dr. El-Khatib saw Thompson on April 24, 2003 and reported he did "very well" postoperatively and was recovering "extremely well" from the operation. (R. 232). Dr. El-Khatib advised Thompson that he could return to his driving job, but told him to avoid shoveling for another six weeks. (R. 232). Consistent with Dr. El-Khatib's findings, Dr. Sethi noted in April 2003 that Thompson had done "remarkably well" post-operatively and that he exhibited "remarkable improvement in his exercise tolerance and shortness of breath." (R. 251). Although Thompson complained of some soreness in his chest, Dr. Sethi advised that it was because of his incision. Finally, Dr. Sethi noted that Thompson's physical exam and EKG were unremarkable. (R. 251).

In May 2003, Dr. Sethi completed a medical report summarizing Thompson's medical history. (R. 245-48). Therein Dr. Sethi noted that Thompson had no end organ damage and had exhibited neither symptoms of heart failure nor uncontrolled repeated episodes of syncope or near-syncope. (R. 245). He also had no discomfort of myocardial ischemic origin. (R. 246). Dr. Sethi assessed Thompson's current activity level as "normal" and opined that he could do

work which involved lifting up to 10 pounds frequently and 20 to 50 pounds occasionally. (R. 247, 249-250). Furthermore, Thompson had no limitation in standing, walking, or sitting and could frequently perform postural activities, except for climbing, which he was limited to doing occasionally. (R. 249-50).

On February 17, 2004 Thompson presented to Dr. Sethi complaining of exhaustion, an inability to work, shortness of breath, and fatigue. (R. 268). Accordingly, Dr. Sethi ordered a cardiolite stress study, which revealed that Thompson had "very good" exercise tolerance and he reached 98% of the maximum heart rate. (R. 268-69). A cardiolite myocardial perfusion scan showed his left ventricular size was normal with only a "slight" perfusion defect, which appeared to be from "artifacts." (R. 269). Moreover, the study revealed no blockage in his arteries. (R. 266).

Vocational expert L. Leon Reid, Ph.D. provided expert testimony at the hearing. (R. 45-49). The ALJ asked Dr. Reid whether work was available in the national economy for a younger individual who had limited education, could not climb, and was limited to light work performed in a "controlled" environment which was free of excessive dust, fumes, and pollutants and that did not expose him to hazards. (R. 46). The VE testified that the individual could perform a significant number of jobs in the national economy such as house sitter (150,000 jobs), vehicle washer (201,300 jobs), and inserter/tagger (120,000 jobs). (R. 46-47).

IV.     **Standards of Review**

Judicial review of the Commissioner's final decision on disability claims is provided by 42 U.S.C. §§ 405(g)[1] and 1383(c)(3).[2] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), disability decisions rendered under Title II are pertinent to those rendered under Title XVI. *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990).

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS,* 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Ventura*, 55 F.3d at 901 *quoting Richardson*; *Stunkard v. Secretary of the Dep't of Health and Human Servs.*, 841

---

[1] Section 405(g) provides in pertinent part:
Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business . . . .

[2] Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

F.2d 57, 59 (3d Cir. 1988). The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).

In making this determination, the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87"; (parallel and other citations omitted).

An ALJ must do more than simply state factual conclusions, but instead must make specific findings of fact to support the ultimate findings. *Stewart*, 714 F.2d at 290. In making a determination, the ALJ must consider and weigh all of the evidence, both medical and non-

medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain the reasons for rejecting such supporting evidence, especially when testimony of the claimant's treating physician is rejected. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician: "an ALJ is not free to set her own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports" and other objective medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

To demonstrate disability under Title II or Title XVI of the Act, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1); 42 U.S.C. § 1383c(a)(3)(A). When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the Commissioner applies a five-step analysis. 20 C.F.R. §§ 404.1520 and 416.920 (1995). *See Sullivan*, 493 U.S. at 525. The United States Court of Appeals for the Third Circuit summarized this five step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999) as follows:

> In *step one*, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied . . . . In *step two*, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

8

> In *step three*, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Step four* requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work . . . .
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final *step [five]*. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ *must analyze the cumulative effect of all the claimant's impairments* in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step . . . .

*Plummer*, 186 F.3d at 428 (emphasis added; certain citations omitted).

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to qualify for benefits in one of two ways:

(1) by introducing medical evidence that the claimant is disabled per se because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (2005), or that the impairment is equivalent to a Listed Impairment. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777 (Steps 1-3); or,

(2) in the event that claimant suffers from a less severe impairment, he or she will be deemed disabled where the claimant is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461, *citing* 42 U.S.C. § 423 (d)(2)(A). In order to prove disability under this second method, claimant

9

first must demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4). *Stunkard,* 841 F.2d at 59; *Kangas,* 823 F.2d at 777. Once it is shown that claimant is unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Campbell,* 461 U.S. at 461; *Stunkard,* 842 F.2d at 59; *Kangas,* 823 F.2d at 777; *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir. 1979).

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Burnett,* 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v. Sullivan,* 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the '[Commissioner] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity'"), *citing* 42 U.S.C. § 423(d)(2)(C), and 20 C.F.R. §§ 404.1523, 416.923.

Section 404.1523, Multiple impairments, provides:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination

10

of impairments, we will determine that you are not disabled (see § 404.1520).

Thus, when a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the [Commissioner] denies the payment of disability benefits." *Bittel,* 441 F.2d at 1195. Even if a claimant's impairment does not meet the criteria specified in the listings, he must be found disabled if his condition is *equivalent* to a listed impairment. 20 C.F.R. § 404.1520(d) (2002). To that end, the ALJ may not just make conclusory statements that the impairments do not equal a Listed Impairment in combination or alone, but rather, is required to set forth the reasons for the decision, and specifically explain why a claimant's impairments did not, alone or in combination, equal in severity one of the Listed Impairments. *Fargnoli,* 247 F.3d at 40 n. 4, *citing Burnett,* 220 F.3d at 119-20.

If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to past employment or perform substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [believed necessary] to make a sound determination." *Ferguson,* 765 F.2d at 36.

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65 (3d Cir. 1987), *relying on Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security,* 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.* When a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the

11

pain or symptom, and the extent to which it affects the individual's ability to work. This evaluation obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. 404.1529(c) (2002). *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in the decision. *See Cotter*, 642 F.2d at 705. The United States Court of Appeals for the Third Circuit has stated: "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433, *quoting* Social Security Ruling ("SSR") 95-5p.

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195. Although "there must be objective medical evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749 F.2d at 1070-71, *quoted in Mason,* 994 F.2d at 1067. Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount claimant's pain without contrary medical evidence. *Ferguson*, 765 F.2d at 37; *Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987). "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence. Instead, the Secretary must present *evidence to*

*refute the claim. See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence)."

V.   **Discussion**

Thompson advances five arguments in this appeal. First, he contends that the ALJ failed to evaluate properly whether his impairments, individually or in combination, met or equaled the listings. Next, Thompson claims that the VE's testimony was based on an incomplete hypothetical question. Third, he argues that the VE's testimony conflicted with the Dictionary of Occupational Titles (DOT). Fourth, Thompson claims that the ALJ erred when he made an adverse credibility determination. Finally, he seeks a remand pursuant to the sixth sentence of 42 U.S.C. §405(g) because of new and material evidence. Thompson's claims are addressed herein *seriatim*.

    A.   *Evaluation of Plaintiff's Impairment*

Thompson argues that the ALJ failed to evaluate properly whether his impairments or the combined effect of his impairments equaled the severity requirements of 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (2005). Specifically, Thompson claims the ALJ did not explain why he does not suffer from a listed impairment as required by the Court of Appeals in *Burnett*, 220 F.3d 112 (3d Cir. 2000).

In *Burnett*, the Court of Appeals found that an ALJ's finding at step three of the sequential process was so conclusory that it was "hopelessly inadequate" and "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119-20. More recently, in *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third Circuit clarified that "the function of *Burnett* is to ensure

13

that there is sufficient development of the record and explanation of findings to permit meaningful review" when the ALJ's decision is "read as a whole." *Id.* at 505. Thompson claims that the ALJ failed to "give any explanation as to how he determined that the individual impairments did not meet the individual listings" and failed to "discuss whether the combined effect of [Thompson's] impairments equaled a listing." Pl. Br. at 8.

Contrary to Thompson's argument, when read as a whole, the ALJ's decision discusses the appropriate factors and provides a sufficient explanation for his conclusion that Thompson's impairments did not meet an Appendix 1 listing. Specifically, the ALJ compared Thompson's hypertension, hypercholesterolemia, and coronary artery disease to the statutory definitions of the impairments. *See* 20 C.F.R. No. 4, Subpt. P, App. 1 §§4.03, 404 (2005). The ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (R. 18). Accordingly, the ALJ found the impairments "either singly or in combination" were not severe enough to meet or medically equal a listing in Appendix 1. (R. 18). The ALJ's decision also complied with 20 C.F.R. §§40431526(a)-(c) (2004) by considering the report of Frank Bryan, M.D., the State agency medical consultant who reviewed Thompson's medical records and found that his impairments did not meet the severity of an Appendix 1 listing. (R. 254-63). Plaintiff fails to cite any specific evidence indicating that Dr. Bryan's opinion is incorrect. Therefore, no opinion from a medical expert was needed under Social Security Ruling 96-6p, 61 Fed. Reg. 34466, 34468 (1996). The ALJ's opinion, read as a whole, meets the standards for the Appendix 1 evaluation set forth in *Burnett* and *Jones*.

  B. *Hypothetical to the Vocational Expert*

Thompson next claims that the ALJ erred when he relied on the VE's response to an incomplete hypothetical question. The ALJ asked the VE:

> Dr. Reid, please assume a younger individual with a limited education, precluded from performing all but light work that is with no hazards, a controlled environment – and by that – I define that as free of excessive dust, fumes, and pollutants – no climbing. With those limitations, can you describe any work this hypothetical individual can perform?

(R. 46). Thompson asserts that the hypothetical was defective because it did not include his chest pain, exhaustion, need to rest for 45 minutes between tasks, inability to walk more than 50 feet at a time, shortness of breath, dyspnea on exertion and hand swelling. (R. 136).

Thompson correctly notes that the VE's testimony may only be considered if the hypothetical "accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). But the hypothetical question need only reflect impairments that are supported by the objective medical record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). The ALJ does not have to accept a claimant's testimony concerning subjective symptoms and does not have to credit VE testimony based on such testimony. *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987). As discussed in the next section, the ALJ's hypothetical question to the VE accurately portrayed Thompson's impairments.

C.   *Credibility of the Plaintiff*

Thompson claims the ALJ erred when he made an adverse credibility determination. When evaluating the credibility of subjective symptoms, including pain, the ALJ must first look for objective medical evidence supporting those symptoms. *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. §404.1539). If the ALJ finds there are objective medical impairments supporting the alleged symptoms, he "must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Id.* This requires the ALJ to determine the credibility and accuracy of the plaintiff's statements concerning subjective

symptoms. *Id.*

In this case, the ALJ found that Thompson's subjective allegations of chest pain and exhaustion were not supported by objective medical evidence. (R. 17). Significantly, the ALJ noted that none of the physicians who treated Thompson identified any condition or limitation that would prevent him from working at some level. (R. 18, 19). After comparing opinions of Thompson's treating physicians with his subjective complaints, the ALJ determined that Thompson retained the RFC to perform a wide range of light work. (R. 19).

A review of the ALJ's opinion shows that he made specific findings concerning the credibility of Thompson's complaints. Thompson's allegations of subjective impairments are not supported by the medical record and, in some cases, directly contradict his own statements to his physicians. When evaluating the credibility of Thompson's allegations of chest pain and exhaustion, the ALJ considered that the pain was relieved with nitroglycerin, including a nitroglycerin patch. Dr. Sethi found it "unclear" why Thompson did not wear a nitroglycerin patch every day. (R. 216). He also stated he was "not so short of breath" and did not become exhausted as easily as before his operation. (R. 17, 35, 137, 216). The medical record also shows that Thompson did not experience discomfort of ischemic origin, despite complaints of chest discomfort. (R. 246). In addition, the record indicates that Thompson could lift 25 pounds and walk an "unlimited" amount on level ground. (R. 17, 135, 218). Finally, there is no indication of ongoing hand swelling. (R. 151-253, 266-74).

The ALJ also evaluated Thompson's behavior and lifestyle in determining the credibility of his complaints. Thompson stated that he was "okay" with taking care of his personal needs and that he regularly performed various household chores. (R. 129, 133-35). Thompson trimmed his 1-acre yard on a riding lawnmower, drove an average of 70 miles each week to the

16

grocery store "or something," and regularly went fishing and hunting. (R. 34, 41-42, 134-35).[3]
In light of these facts, the ALJ reasonably concluded that Thompson did not lead a "disabled lifestyle." (R. 17).

The record also reveals that the ALJ had a sufficient basis to find that some of Thompson's subjective symptoms were exaggerated. Dr. Bryan opined that Thompson could do at least light-type work and Dr. Sethi found that he could engage in a variety of light work with his credible subjective complaints. (R. 254-63, 249-50). In light of these opinions from Thompson's treating physicians, the ALJ did not err in evaluating Thompson's credibility and he included all of the requisite limitations in the hypothetical question he posed to the VE.

D.   *Vocational Expert's Testimony*

Thompson next claims that the ALJ erred in relying the testimony of the VE because it conflicted with the DOT, which does not include the job of "vehicle washer."[4] In addition, Thompson's wife testified based on her personal experience that the "inserter/tagger" job identified by the VE required more than light lifting. (R. 22-3). Significantly, Thompson does not claim that the VE's testimony concerning the housesitter and inserter/tagger jobs conflicted with the DOT.

Defendant concedes that the VE's identification of "vehicle washer" as a viable job for Plaintiff was erroneous. Nevertheless, the VE identified over 270,000 housesitter and inserter/tagger jobs in the national economy, which demonstrates that Thompson was not entitled

---

[3] Plaintiff's hunting and fishing exceed the two "sporadic" instances of hunting which did not preclude a finding of disability in *Akers v. Callahan*, 997 F. Supp. 648, 660 (W.D. Pa. 1998).

[4] The VE listed vehicle washer as 599.684-010 in the DOT. However, the DOT lists 599.684-010 as "Equipment Cleaner," which falls into a heavy work category. *Dictionary of Occupational Titles*, U.S. Department of Labor, 508 (4th ed., rev. 1991). Automobile Washer, a medium work job, is listed as an alternate title for Steam Cleaner at 915.687-026 in the DOT.

to DIB. (R. 46-47). The Court of Appeals for the Third Circuit has held that as few as 200 jobs in the local economy "is a clear indication that there exists in the national economy other substantial gainful work." *Craigie*, 835 F.2d at 58. Thompson fails to cite any vocational authority to support his claim that the housesitter jobs should be ruled out because they are "limited in duration." Thus, the ALJ properly relied on the VE's testimony concerning the housesitter jobs.

Thompson also fails to cite any vocational authority for his claim that inserter/tagger jobs require more than light work. The description of inserter/tagger work given by Thompson's wife, when she claimed that inserter/tagger work involved inserting tags into newspapers and carrying stacks of 50 newspapers to conveyor belts, differs from the description found in the DOT. (R. 49). In contrast, the VE described inserter/tagger work as consisting of inserting paper tags into the slots of guide devices attached to index file cards, as described in the DOT under 794.681-058. *See Dictionary of Occupational Titles*, U.S. Department of Labor, 841 (4th ed., rev. 1991). Therefore, Thompson's wife's opinion regarding the exertional requirements for the inserter/tagger position was not probative.

Excluding the vehicle washer jobs, there are 1,250 jobs in the local economy and 270,000 jobs in the national economy which Thompson can perform. Accordingly, the ALJ did not err in denying Thompson's request for DIB.

    E.    *New and Material Evidence*

Thompson's last argument is that the case should be remanded pursuant to 42 U.S.C. §405(g) because of the existence of new and material evidence. To satisfy this standard, "the evidence must be 'new' and not merely cumulative of what is already in the record. *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). The evidence must

also be "material," meaning that there be a reasonable possibility that it would have changed the result of the decision below. *Id.*

Thompson claims that the result of a cardiac catheterization conducted by Dr. Sethi in October 2004 constitutes new and material evidence warranting a remand. That catheterization showed Thompson had a normal functioning prosthetic aortic valve, with minimal narrowing and no significant restenosis of his right coronary artery. The procedure revealed mild atherosclerosis of the left circumflex artery, an improvement over the moderate atherosclerosis of the left circumflex artery reported after the May 2001 catheterization. (R. 180). The total occlusion of the left anterior descending artery with a 90% stenosis distally remained the same as in the May 2001 examination. (R. 179). The October 2004 report also indicates that if the angina pectoris continues, Thompson may be a candidate for percutanious transluminal coronary angioplasty and stent placement of the distal left anterior descending artery. Otherwise, Dr. Sethi advised Thompson to continue with his current medical management.

As Thompson concedes, this report is nearly identical to his previous cardiac catheterization reports, with the exception of the *possibility* of future surgery. However, Dr. Sethi does not mention any of Thompson's subjective complaints in this report. Indeed, the report is substantially similar to previous catheterization reports. Additionally, Dr. Sethi did not make any changes to Thompson's treatment. The only new element in this report is Dr. Sethi's note concerning the possibility of future surgery. Otherwise, Thompson's condition remains essentially the same as when the ALJ issued his opinion. Thus, the cardiac catheterization report of October 20, 2004 plainly fails to meet the new and material evidence standard of section §405(g).

## VI. Conclusion

The Court has reviewed the ALJ's findings of fact and decision and determines that his ruling is supported by substantial evidence. Accordingly, the Court will deny Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision below.

An appropriate order follows.

*Thos M. Hardiman*
Thomas M. Hardiman
United States District Judge

October 31, 2005

cc: counsel of record